UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                            :
UNITED STATES OF AMERICA,                   :
                                            :
v.                                          :                12 Cr. 445 (JMF)
                                            :
JUAN FERNANDEZ et al.,                      :                OPINION AND ORDER
                                            :
                   Defendants.              :
                                            :
------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

The Indictment in this case charges twenty defendants with participating in a conspiracy,

from at least December 2011 to June 2012, to distribute various controlled substances, and

charges six of the defendants — Edward Brown, Juan Fernandez, Emmanuel Miller, Rolando

Montes, Ramon Morales, and Odell Scarborough — with possession and use of a firearm in the

course of a drug trafficking crime, in violation of Title 18, United States Code, Sections

924(c)(1)(A)(iii) and 924(c)(2).  Fernandez, Montes, and Jose Valdez, joined by Morales and

Brown, now move to suppress evidence obtained pursuant to a court-authorized wiretap of a

cellphone allegedly used by Morales.  In particular, they contend that the Government failed to

demonstrate in its applications that the wiretap was "necessary," as required by Title III of the

Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2518(1)(c) & (3)(c).  In

addition, Valdez argues that the wiretap was deficient because the Government failed to identify

him as a target subject of the proposed interception, even though it had probable cause to believe

he was committing a crime and would be intercepted by the wiretap.[1]

---

[1]    In his motion, Valdez also moves for a severance.  (Docket No. 181).  In recent filings, other Defendants have requested severance or sought leave to request severance closer to trial. (Docket Nos. 188 & 189).  The Court will address the question of severance separately.

For the reasons stated below, Defendants' motions are DENIED.

## BACKGROUND

The present case arises from a joint investigation involving the Drug Enforcement Administration ("DEA") and the New York City Police Department ("NYPD") of an alleged gang called the "Murder Moore Gangstas" ("MMG") operating in and around the Moore Housing Projects in the Bronx, New York. (Aff. of DEA Special Agent Stephen Chokshi, dated Mar. 7, 2012 ("First Chokshi Affidavit") ¶ B3(1)).[2] In or about January 2012, a confidential informant ("CI-1") advised law enforcement agents that a man CI-1 knew as "Seven," later identified as Morales, had been supplying members of MMG with crack cocaine for several years. (*Id.* ¶ B3(2)(a)). On January 4, 2012, law enforcement officers began a series of undercover purchases of crack cocaine and other drugs from suspected MMG members, including Morales. (*Id.* ¶¶ B3(4-24)). Specifically, between January 4, 2012, and February 22, 2012, undercover officers made at least ten purchases of either cocaine or marijuana from Morales and his alleged associates, including Eugene Miller and Dennis Sanders, for amounts ranging from $60 to $200. (*Id.*). In one transaction, Morales also indicated to the undercover officer that he had access to firearms and ammunition. (*Id.* ¶ B3(24)).

In the course of this investigation, CI-1 obtained Morales's cellphone number (the "Morales Cellphone"). (*Id.* ¶ B3(6)). On March 7, 2012, the Government submitted an application, supported by an affidavit of DEA Special Agent Stephen Chokshi, to wiretap the Morales Cellphone. The affidavit stated that there was probable cause to believe that one or more of the target subjects — identified as Morales, Sanders, and Eugene Miller — had

---

[2]     The First Chokshi Affidavit is attached as Exhibit A to the Affirmation of Paula J. Notari, dated November 28, 2012. (Docket No. 139).

committed, were then committing, and would continue to commit various narcotics crimes, and would use the Morales Cellphone on a continuing basis in furtherance of those crimes. (*Id.* ¶ B1). Chokshi detailed the investigation to date — including the undercover purchases (*id.* ¶¶ B3(4-24)), physical surveillance, and analysis of telephone records (*id.* ¶¶ C4, B4(1-2)) — from which law enforcement authorities learned that members of MMG were responsible for selling crack cocaine and were believed to be responsible for multiple shootings (*id.* ¶ B3(1)). Chokshi affirmed that the wiretap was necessary to effectuate the objectives of the investigation, including, *inter alia*, to uncover the identities of the participants in the alleged illegal enterprise; to reveal the nature, extent, and methods of MMG's illegal activities; and to determine the "source, receipt, and distribution" of contraband and drug-related money. (*Id.* ¶ A5).

Special Agent Chokshi also enumerated reasons why he believed that traditional investigative procedures were unlikely to be successful in fulfilling these objectives. He acknowledged that certain techniques — such as the use of undercover officers and a confidential informant, analyses of telephone records, and physical surveillance of suspected members of MMG — had been helpful in revealing the existence of an ongoing illegal narcotics and firearms enterprise, but explained that these techniques had not yielded sufficient evidence to achieve the investigation's objectives. (*Id.* ¶¶ C1-4, 7). For example, with respect to the use of undercover officers, Special Agent Chokshi stated that MMG members were "unlikely to discuss the full extent of their organizations' activities or membership when dealing with an 'outsider' such as an undercover officer." (*Id.* ¶ C2). The use of confidential informants faced similar shortcomings, as suspected MMG members were unlikely to reveal to an informant the source of their drugs or the manner in which the narcotics were transported. (*Id.*). Analyses of telephone records similarly provided only limited information, as the records did not provide real-time

evidence of the content of the communications.  (*Id.* ¶ C7).  Special Agent Chokshi also described the limitations of physical surveillance, noting that although surveillance can be useful in uncovering information concerning an individual's identity, it "provides limited direct evidence of the significance of drug-related meetings."  (*Id.* ¶ C4).  Further, because Morales and the other suspected MMG members discussed narcotics-related activity over the telephone and lived in apartments that were difficult to observe from surveillance units on the street, physical surveillance was of limited utility in this particular case.  (*Id.*).

Special Agent Chokshi further stated that additional techniques — including witness interviews, arrests, the execution of search warrants, trash searches, and convening a grand jury — had been considered, but for various reasons were unlikely to succeed.  (*Id.* ¶¶ C6, 8-11).  For instance, he explained that search warrants were not appropriate at that stage of the investigation, as the locations where MMG members conducted their narcotics operations had not been fully identified and searches of possible locations would alert MMG members to the investigation "without the likelihood of determining with certainty the full scope of their operations or actually seizing narcotics."  (*Id.* ¶ C9).  Similarly, Special Agent Chokshi opined that witness interviews, arrests, and the issuance of grand jury subpoenas to potential witnesses were unlikely to lead to the discovery of criminal information and would alert gang members to the ongoing investigation.  (*Id.* ¶¶ C8, C10).  Finally, Chokshi explained that although two pole cameras were to be installed in the vicinity of the suspected drug-related activity, video footage was not a reasonable alternative to intercepting wire communications because Morales and other suspects discussed narcotics-related activities over the telephone, in vehicles, or in apartment buildings, which were not amenable to video surveillance.  (*Id.* ¶ C5).  Further, like physical surveillance, a pole camera could capture meetings, but not the content of those meetings.  (*Id.*).

4

On March 7, 2012, the Honorable Denise L. Cote, United States District Judge for the

Southern District of New York approved the Government's application and authorized the

interception of communications over the Morales Cellphone for a period of thirty days.  During

the period of interception, the Government allegedly intercepted various calls between Morales

and other individuals concerning narcotics transactions and the sale of firearms.  (Aff. of DEA

Special Agent Stephen Chokshi, dated Apr. 11, 2012 ("Second Chokshi Affidavit") ¶ B3(25)).[3]

Based on these calls, among other things, on April 11, 2012, the Government submitted an

application, again supported by an affidavit of Special Agent Chokshi, for reauthorization of the

Morales wiretap for another thirty days.

The Second Chokshi Affidavit provided additional details regarding the investigation.

Among other things, Chokshi detailed ten calls on the Morales Cellphone between March 14,

2012, and April 8, 2012, relating to the sale of firearms; the receipt, possession, and sale of

narcotics; and acts of violence in furtherance of the illegal enterprise.  (*Id.* ¶ B3(25)).  Further,

Chokshi reported that, based on information obtained from these calls and other investigative

efforts, law enforcement agents had identified several other people allegedly working for the

enterprise — Brown, Fernandez, Scarborough, and Yemalia Ayala — and had discovered several

locations at which drug transactions had occurred.  (*Id.* ¶ C1).  Despite this new information,

Chokshi averred that the investigation still had not identified the full scope of the trafficking

organization, including its membership, sources of narcotics, and methods of operation.  (*Id.*

¶¶ C1, 13).  The Second Chokshi Affidavit also provided many of the same explanations

regarding the inadequacy of alternative investigative techniques offered in the First Chokshi

---

[3]      The Second Chokshi Affidavit is attached as Exhibit B to the Affirmation of Paula J.
Notari, dated November 28, 2012.  (Docket No. 139).

Affidavit, and explained that although the two pole cameras had been installed, much of the activity in the investigation was not amenable to video surveillance.  (*Id.* ¶ C6).

On April 11, 2012, the Honorable Barbara S. Jones, then United States District Judge for the Southern District of New York, approved this second application and reauthorized the Morales wiretap for another thirty-day period.  During this second thirty-day period, the Government intercepted more calls concerning narcotics transactions and firearms.  (Aff. of DEA Special Agent Stephen Chokshi, dated May 17, 2012 ("Third Chokshi Affidavit") ¶ B3 (25(j)-(p))).[4]  Eleven of these calls were described in a third application for reauthorization of the Morales wiretap, dated May 17, 2012, again supported by an affidavit from Special Agent Chokshi.  (*Id.*).  The Third Chokshi Affidavit listed additional information the Government had acquired as a result of the wiretap, including an additional person working for the organization, Emmanuel Miller.  (*Id.* ¶ C1).  It once again detailed the deficiencies of traditional methods of investigation (*see, e.g., id.* ¶¶ C3-12), and explained that the investigation had not yet uncovered the full scope of the drug trafficking organization, including its methods of operation, membership, and sources of narcotics.  (*Id.* ¶¶ C1, 13).

On May 17, 2012, the Honorable Sidney H. Stein, United States District Judge for the Southern District of New York, approved this third application and authorized the Government to intercept calls over the Morales Cellphone for another thirty days.  On June 14, 2012, Defendants were arrested.

---

[4]     The Third Chokshi Affidavit is attached as Exhibit C to the Affirmation of Paula J. Notari, dated November 28, 2012.  (Docket No. 139).  On April 30, 2012, the Government obtained authorization to wiretap a cellphone allegedly used by Defendant Eugene Miller.  No Defendant in this case has challenged the Miller wiretap.

## APPLICABLE LAW

Under Title III, a court may authorize a wiretap based upon a showing of probable cause

that (1) an individual is committing, has committed, or is about to commit, a crime;

(2) communications concerning that crime will be obtained through the wiretap; and (3) the

telephone to be wiretapped is being used for criminal purposes or is about to be used or owned

by the target of the wiretap. *See* 18 U.S.C. § 2518(3); *see also, e.g., United States v. Yannotti*,

541 F.3d 112, 124 (2d Cir. 2008). Probable cause requires that the "totality of the

circumstances" reflect a "fair probability that . . . evidence of a crime will be found." *Illinois v.*

*Gates*, 462 U.S. 213, 238 (1983); *see also, e.g., United States v. Diaz*, 176 F.3d 52, 110 (2d Cir.

1999). The issuing judicial officer must "make a practical, common-sense decision whether,

given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that

. . . evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.

In addition to finding probable cause, to authorize a wiretap under Title III, a judicial

officer must make a finding that "normal investigative procedures have been tried and have

failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C.

§ 2518(3)(c). Accordingly, Title III requires each application for a wiretap to include a "a full

and complete statement as to whether or not other investigative procedures have been tried and

failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."

*Id.* § 2518(1)(c).[5] This "necessity" requirement is "designed to assure that wiretapping is not

resorted to in situations where traditional investigative techniques would suffice to expose the

---

[5]     "Normal" investigative procedures "include (1) standard visual and aural surveillance;
(2) questioning and interrogation of witnesses or participants (including the use of grand juries
and the grant of immunity if necessary); (3) use of search warrants; and (4) infiltration of
conspiratorial groups by undercover agents or informants," as well as "pen registers and trap and
trace devices." *United States v. Cline*, 349 F.3d 1276, 1280 (10th Cir. 2003) (internal quotation
marks omitted).

7

crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). As the Supreme Court has explained, wiretaps are "not to be routinely employed as the initial step in criminal investigation. Rather, the applicant must state and the court must find that normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." *United States v. Giordano*, 416 U.S. 505, 515 (1974).

Courts, however, must take a "common sense approach" to the necessity requirement. *United States v. Concepcion*, 579 F.3d 214, 218 (2d Cir. 2009); *see also, e.g.*, *United States v. Labate*, No. S100 Cr. 632 (WHP), 2001 WL 533714, at *13 (S.D.N.Y. May 18, 2001) (stating that the necessity requirement is not "an insurmountable hurdle and only requires that the Government demonstrate that normal investigative techniques would prove difficult" (internal quotation marks omitted)). In particular, although "generalized and conclusory statements that the other investigative procedures would prove unsuccessful" are not sufficient, "the Government is not required to exhaust all conceivable investigative techniques before resorting to electronic surveillance." *Concepcion*, 579 F.3d at 218 (internal quotation marks omitted); *United States v. Young*, 822 F.2d 1234, 1237 (2d Cir. 1987) (stating that there is no requirement under Title III that "that any particular investigative procedures be exhausted before a wiretap may be authorized" (internal quotation marks omitted)). Moreover, "[m]erely because a normal investigative technique is theoretically possible, it does not follow that it is likely. What [Title III] envisions is that the showing be tested in a practical and commonsense fashion." *Concepcion*, 579 F.3d at 218 (quoting S. Rep. No. 90-1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2190)) (internal quotation marks omitted). At bottom, Title III "only requires that the agents inform the authorizing judicial officer of the nature and progress of the

8

investigation and of the difficulties inherent in the use of normal law enforcement methods." *Id.* (quoting *Diaz*, 176 F.3d at 111) (internal quotation mark omitted).

Applying these principles, the Court of Appeals has noted that wiretapping "is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation." *United States v. Fleishman*, No. 11 Cr. 32 (JSR), 2011 WL 4000987, at *3 (S.D.N.Y. Aug. 31, 2011) (quoting *United States v. Steinberg*, 525 F.2d 1126, 1131 (2d Cir. 1975) ("[T]he very scope of the operations described in the affidavit made it highly likely that numerous narcotics-related communications would take place in the future.")). Further, courts have acknowledged that "the need for a wiretap may be compelling" in conspiracy cases, as "the clandestine nature of alleged conspiracies makes them relatively less susceptible to normal investigative techniques." *United States v. Kazarian*, No. 10 Cr. 895 (PGG), 2012 WL 1810214, at *2 (S.D.N.Y. May 18, 2012) (quoting *United States v. Feola*, 651 F. Supp. 1068, 1105 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989)) (internal quotation mark omitted). Thus, the Court of Appeals and courts in this Circuit have repeatedly "approved of wiretaps in complex and sprawling criminal cases involving large conspiracies." *Concepcion*, 579 F.3d at 218 (citing *United States v. Torres*, 901 F.2d 205, 232 (2d Cir. 1990), *overruled on other grounds as recognized by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010)); *see also, e.g.*, *United States v. Rodriguez-Perez*, No. 10 Cr. 905 (LTS), 2012 WL 3578721, at *5 (S.D.N.Y. Aug. 16, 2012) (approving a wiretap in a marijuana conspiracy and money laundering case involving more than fifty defendants); *Kazarian*, 2012 WL 1810214, at *26 (approving a wiretap in "an investigation of a complex and far-flung criminal enterprise").

Significantly, a defendant seeking to suppress an authorized wiretap "bears a significant burden." *Rodriguez-Perez*, 2012 WL 3578721, at *6. In particular, once a judge has made the

9

requisite probable cause and necessity determinations, any court reviewing those determinations

must grant "considerable deference" to the authorizing judge. *Concepcion*, 579 F.3d at 217 &

n.1; *accord Yannotti*, 541 F.3d at 124.  More specifically, the reviewing court's role is limited to

"decid[ing] if the facts set forth in the application were minimally adequate to support the

determination that was made." *Yannotti*, 541 F.3d at 124 (quoting *United States v. Miller*, 116

F.3d 641, 663 (2d Cir. 1997)) (internal quotation mark omitted); *accord Concepcion*, 579 F.3d at

217; *cf. United States v. Tortorello*, 480 F.2d 764, 783 (2d Cir. 1973) ("A judge presumably will

scrutinize any application and will scrupulously impose the restrictions required by statute.").

## DISCUSSION

Measured against these standards, Defendants' motions to suppress the fruits of the

Morales wiretap are easily rejected.  First, as a general matter, this case involves precisely "the

type of large criminal drug conspiracy that often requires the aid of a wiretap." *Concepcion*, 579

F.3d at 219.  The Government's investigation targeted a secretive drug trafficking organization

and street gang that had been operating in the Bronx for several years.  (First Chokshi Aff.

¶¶ A2-5).  And like most such organizations, it had a hierarchical structure with members

playing different roles, some of which were more amenable to traditional methods of

investigation than others.  By its nature, therefore, the organization "was a large scale operation

which could not be adequately surveilled by traditional investigative methods." *Torres*, 901 F.2d

at 232; *see also, e.g.*, *United States v. Mitchell*, No. 08-CR-6020L, 2010 WL 55927, at *4

(W.D.N.Y. Jan. 5, 2010) (approving wiretap in a case involving "a large scale narcotics

trafficking operation which could not be adequately investigated by traditional methods");

*United States v. Bernardino*, 07 Cr. 151 (PKC), 2007 WL 4462176, at *2 (S.D.N.Y. Dec. 17,

2007) (approving wiretap in a case involving a "large-scale cocaine-trafficking network").

10

Second, and in any event, Special Agent Chokshi's First Affidavit made more than a sufficient showing that other investigative techniques had been tried and either failed or were likely to fail or be too dangerous. Among other things, he explained — for reasons specific to this case — that while the investigation had made use of undercover officers and a confidential informant, there was no reasonable expectation that an undercover officer or confidential informant could be used to determine the full scope of the organization's operations, meet and identify all of its members, or identify its drug suppliers. (First Chokshi Aff. ¶¶ C2-3).[6] He further explained — again, for reasons specific to this case — that, while the investigation had made use of physical surveillance and pole cameras, such techniques had only limited utility. (*Id.* ¶¶ C4-5). And he also addressed the benefits, or lack thereof, of geolocation devices (*id.* ¶ C6), telephone records and pen registers (*id.* ¶ C7), witness interviews and grand jury subpoenas (*id.* ¶ C8), search warrants (*id.* ¶ C9), arrests (*id.* ¶ C10), and trash searches (*id.* ¶ C11). In short, the affidavit made clear that wiretapping was far from the first step in the investigation, and included a lot more than "generalized and conclusory statements" or "skimpy" details about the traditional techniques tried and why they failed or were likely to fail. *Concepcion*, 579 F.3d at 215. At a minimum, the facts set forth in the application were plainly "minimally adequate to support the determination that was made" by Judge Cote. *Yannotti*, 541 F.3d at 124.

---

[6]     As the Government concedes, Special Agent Chokshi's affidavit did contain one error: It stated that CI-1 was "introduced to Morales as a representative" of the undercover officer, when in fact it was the other way around. (Mem. of Law in Opp'n 19 n.7). The relationship between CI-1 and the undercover officer, however, is more accurately described elsewhere in the affidavit. (*See, e.g.*, First Chokshi Aff. ¶¶ B3(6-7)). Moreover, the error has no bearing on either probable cause or necessity, so it is not grounds for suppression. *See, e.g.*, *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2010 WL 4867402, at *7, 18 (S.D.N.Y. Nov. 24, 2010) (stating that, to warrant suppression of a wiretap, a defendant must show, among other things, that after inserting omitted information and setting aside misstatements, the affidavit fails to establish either probable cause or necessity (citing *United States v. Coreas*, 419 F.3d 151, 155 (2d Cir. 2005))).

In arguing otherwise, Defendants contend that traditional techniques — especially the investigation's use of undercover officers and confidential informants — had "proven incredibly effective, both at identifying targets and in gathering evidence against them." (Fernandez Mem. of Law in Supp. of Def.'s Pretrial Mots. ("Fernandez Mem.") 4; *see also* Mem. of Law in Supp. of Pretrial Mots. of Def. Montes ("Montes Mem.") 9-11; Mem. of Law in Supp. of Def. Valdez's Pretrial Mots. ("Valdez Mem.") 4-5). Fernandez, for example, asserts that, even without the wiretap, the Government had "already successfully identified virtually every key member of the organization" and "several potential drug stash houses." (Fernandez Mem. 5). If anything, however, the fact that the Government turned to Title III only after pursuing these other techniques for as long as it did makes clear that it did not resort to a wiretap as "the initial step in criminal investigation." *Giordano*, 416 U.S. at 515; *see also Miller*, 116 F.3d at 663. Moreover, as noted, the Court of Appeals has made clear that no "particular investigative procedures [must] be exhausted before a wiretap may be authorized." *Young*, 822 F.2d at 1237 (internal quotation marks omitted). That is especially true where, as here, use of such procedures would run the risk of revealing the Government's investigation, and thus ending it, before the Government has fully accomplished its objectives. (First Chokshi Aff. ¶¶ C8-10).

In any event, in making this argument, Defendants greatly exaggerate the effectiveness of the Government's investigation prior to the wiretap. By March 7, 2012, when Judge Cote approved the first wiretap, the Government had identified only a few of the defendants and had identified even fewer — namely, Morales, Sanders, and Eugene Miller — as members of MMC; in fact, the affidavit itself referenced several unidentified members of the organization. (*Id.* ¶¶ A3, B3(10, 21)). And while the Government knew of at least three locations tied to the organization's drug dealing, there is no reason to believe that those locations were the only, or

12

even primary, locations used by the organization.  Moreover, as Special Agent Chokshi

explained, searches of those locations would have alerted the targets to the investigation "without

the likelihood of determining with certainty the full scope of their operations or actually seizing

narcotics."  (*Id.* ¶ C9).  At bottom, prior to the wiretap, the investigation was limited to street

purchases of modest quantities of drugs from Morales and low-level members of the

organization.  Given the nature of the enterprise, it was reasonable to believe that continuing in

that manner would not reveal the full scope of the organization or identify more than a handful of

its members.

      In that regard, the instant case is easily distinguished from *United States v. Lilla*, 699

F.2d 99 (2d Cir.), upon which Defendants rely.  (Fernandez Mem. 14; Montes Mem. 5).  In that

case, a confidential informant advised a state trooper that Michael Lilla was selling cocaine and

marijuana.  Shortly thereafter, the informant introduced the trooper to Lilla, and the trooper paid

Lilla for a pound of marijuana.  The trooper then discussed purchasing cocaine, and Lilla "said

that his brother was in Florida making arrangements to bring 'coke' and 'grass' . . . that would be

available in a week or two."  *Id.* at 101.  Notwithstanding Lilla's immediate openness, and with

no further investigation, the trooper then sought, and obtained, authorization to wiretap Lilla's

telephone, stating in conclusory fashion that the case "involves other unknown co-conspirators

and that no other investigative method exists to determine the identity of these other persons."

*Id.*  There, unlike here, the case "appeared to involve a relatively small number of individuals"

and to be a "small-time narcotics case."  *Id.* at 104-05 & n.6.  There, unlike here, the affidavit did

not "reveal what, if any, investigative techniques were attempted prior to the wiretap request."

*Id.* at 104.  And there, unlike here, there was "no indication why simple surveillance . . . would

not have been useful."  *Id.*  In short, as in *Concepcion*, the affidavit here "was far more detailed

than the representations made by law enforcement in *Lilla*, where the supporting affidavit indicated that traditional investigative techniques not only *appeared* likely to be effective, but *were* in fact effective." *Concepcion*, 579 F.3d at 220 (citing *Lilla*, 699 F.2d at 100-01, 104).

Nor is there any merit to Fernandez's argument that suppression is warranted on the ground that Special Agent Chokshi omitted material information from his affidavits. (Fernandez Mem. 6-8). Fernandez principally asserts that the local NYPD precinct "had substantial information" about MMC and its members, none of which appeared in the affidavit. (*Id.* at 6). He cites no evidence to back up this claim, however, and it is pure speculation to assert that the information possessed by the NYPD, if any, would have fulfilled the objectives of the investigation and obviated the need for the wiretap. *See Rajaratnam*, 2010 WL 4867402, at *23 ("[S]uppression based on speculation that alternative strategies might have been effective seems inappropriate."); *see also, e.g.*, *United States v. Shipp*, 578 F. Supp. 980, 989 (S.D.N.Y. 1984) (Weinfeld, J.) ("Monday morning quarterbacking as to what investigative techniques the agents should have employed in addition to what they did employ is utterly unrealistic, if not naive."), *aff'd sub nom. United States v. Wilkinson*, 754 F.2d 1427 (2d Cir. 1985). Fernandez also complains that Special Agent Chokshi did not include all identified defendants as targets in the affidavit. (Fernandez Mem. 7-8). Relatedly, Valdez seeks suppression on the ground that he was not identified as a target subject, even after he had been identified by the Government. (Valdez Mem. 9-10). It is well established, however, that Title III does not require the Government to identify all target subjects in a wiretap application. *See Miller*, 116 F.3d at 664-65; *see also, e.g.*, *United States v. Donovan*, 429 U.S. 413, 435 (1977) ("[T]he failure to identify

14

additional persons who are likely to be overheard engaging in incriminating conversations could hardly invalidate an otherwise lawful judicial authorization.").[7]

Thus, Special Agent Chokshi's First Affidavit is plainly sufficient to survive Defendants' motion to suppress the wiretap evidence.  So too are the Second and Third Chokshi Affidavits, dated April 11, 2012, and May 17, 2012, that Special Agent Chokshi submitted in connection with reauthorization of the wiretap.  Contrary to Montes's assertion, the allegations in those affidavits relating to necessity are neither "conclusory" nor "boilerplate."  (Montes Mem. 12).  Instead, they were updated to reflect the additional investigative steps the Government had taken since the First Chokshi Affidavit.  For example, they described the investigators' further attempts at physical surveillance (Third Chokshi Aff. ¶ C5), the use of an additional pole camera (*id.* ¶ C6), and additional information concerning the prospects of obtaining search warrants and making arrests (*id.* ¶¶ C10-11).  Additionally, the Second and Third Chokshi Affidavits acknowledged that the wiretap had led to the preliminary identification of new target subjects and additional locations used by MMC to store weapons and drugs, but explained that the investigators had not "identified the source or supply for the organization, the full scope of membership in MMG, or the methods of operation of MMG."  (*Id.* ¶ C13).  In any event, the law is clear that the use of boilerplate language in a wiretap application, by itself, is not grounds for suppression.  *See, e.g.*, *Kazarian*, 2012 WL 1810214, at *11 ("[T]he fact that the Government has repeatedly made the same or similar statements as to why alternative investigative means are not practical does not mean that those reasons are invalid."); *United States v. Herrera*, No. 02

---

[7]     Valdez also seeks suppression of the wiretap — at least as to him — on the ground that the Government's "first and only investigative step" with respect to him was to intercept his telephone calls.  (Valdez Mem. 8).  But he "cites no law suggesting . . . that the Government is required — in connection with the necessity requirement — to make an individualized presentation as to each target subject and the efficacy of each potential investigative tool as to that target."  *Kazarian*, 2012 WL 1810214, at *11.

CR 0477 (LAK), 2002 WL 31133029, at *2 (S.D.N.Y. Sept. 23, 2002) (upholding the use of "boilerplate" language in a wiretap application, and noting that it "should come as no surprise that the facts supporting the conclusion that the alternative methods would be unavailing often are similar from one narcotics operation to another").

Finally, although Fernandez requests in passing that the Court hold an evidentiary on his motion to suppress the wiretap (Fernandez Mem. 2, 17), there is no basis to do so. Under *Franks v. Delaware*, 438 U.S. 154 (1978), a defendant is entitled to an evidentiary hearing only if he or she makes "a substantial preliminary showing" of an intentional or reckless false statement or omission of material fact and that the allegedly false statement or omission was "necessary" to the finding of probable cause or necessity. *Id.* at 155-56; *see also United States v. Zagari*, 111 F.3d 307, 321-22 (2d Cir. 1997) (applying *Franks* to Title III applications). The standard is "a high one," *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991), and Fernandez does not even come close to meeting it here.

## CONCLUSION

For the reasons stated above, the motions of Defendants Fernandez, Montes, and Valdez, joined by Morales and Brown, are DENIED. The Clerk of Court is directed to terminate Docket Nos. 138, 143, 148, 171. The Clerk shall keep Valdez's motion (Docket No. 181) open pending the Court's decision on the motion for a severance.

SO ORDERED.

Dated: February 7, 2013
     New York, New York

                                   JESSE M. FURMAN
                                United States District Judge

16