UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                :

UNITED STATES OF AMERICA,           :

                        -v-                  :           12-CR-445-1 (JMF)

JUAN FERNANDEZ,                 :             ORDER

                            Defendant.       :

------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

Earlier today, the Court appointed counsel to represent Defendant Juan Fernandez in connection with any application relating to the COVID-19 pandemic. *See* ECF No. 798. Later in the day, the Court received the attached motion for compassionate release ("Motion"), postmarked May 15, 2020, from Fernandez proceeding *pro se*. Fernandez concedes that he has not yet exhausted his administrative remedies. *See* Motion at 10. Instead, he argues that exhaustion should not be required under the current circumstances. *See id.* at 10-14.

This Court has held that it lacks authority to disregard the administrative exhaustion requirement in 18 U.S.C. § 3582(c)(1)(A)(i), absent waiver of the requirement by the Government. *See United States v. Roberts*, No. 18-CR-528-5 (JMF), 2020 WL 1700032, at *2-3 (S.D.N.Y. Apr. 8, 2020). Accordingly, no later than **May 29, 2020**, the Government shall file a letter indicating whether it agrees to waive the exhaustion requirement in this case. If it does not waive the requirement, the motion will be denied without prejudice to renewal after Fernandez has exhausted his administrative remedies. If the Government does waive the requirement, the Government shall file any opposition to Fernandez's motion by **June 2, 2020**, and Fernandez — through counsel — shall file any reply by **June 5, 2020**.

The Clerk of Court is directed to mail a copy of this Order to Fernandez at the following address:

                          Reg. No. 67050-054
                          FCI Fort Dix
                          Federal Correctional Institution
                          P.O. BOX 2000
                          Joint Base MDL, NJ  08640

SO ORDERED.

Dated: May 26, 2020
      New York, New York

                                          JESSE M. FURMAN
                                          United States District Judge

UNITED STATES DISTRICT COURT
SECOND CIRCUIT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | > | |
| Plaintiff, | > | CASE NO.: 12-CR-455 |
| | > | |
| v. | > | |
| | > | |
| JUAN FERNANDEZ | > | |
| Defendant | > | |

EMERGENCY MOTION FOR COMPASSIONATE RELEASE
UNDER 18 U.S.C. 3582

HONORABLE JUDGE FORMAN, Movant JUAN FERNANDEZ, through
Pro-Se, respectfully moves this Court to grant his Motion for
Compassionate Release under 18 U.S.C. 3582(C)(1)(A), and order
the remainder of his sentence to time served or, in the
alternative to Home Confinement for the remainder of his sentence.
This Motion should be granted due to the "Extraordinary and
Compelling Reasons" confronting the Federal Prison System by the
Pandemic of COVID-19 and the fact that Mr. Fernandez's compromised
health, and his status as a "High Risk" who is vulnerable to
contracting the coronavirus, COVID-19, other notable Section
3553(a) factors, would not be undermined by converting the
remainder of his sentence to Home Confinement or Time Served
given the cataclysmic events of the current pandemic. I
respectfully ask the Court to move this Motion on an expedited
basis as each day in custody brings renewed and unthinkable risk
to my life.

## MR. FERNANDEZ IS PROCEEDING IN PRO-SE MANNER:

Because Mr. Fernandez is proceeding Pro Se, this pleading should be held to less stringent than formal papers drafted by lawyers ( Haines v. Kerner, 404 U.S. 519, 520 (1927). Furthermore, because Mr. Fernandez is proceeding Pro Se, this submission must be read to "raise the strongest arguments they suggest" ( Olive v. Columbia Univ, 332 F. Supp. 2d. 599, 607 (SDNY 2004). Aff'd 136 F. App. 383 (2d. Cir. 2005)(Citations omitted); See, also Triestman v. Federal Bureau of Prisons, 470 F. 3d. 471, 474 (2nd Cir. 2006) (observing that Pro Se litigants must be treated with "Special Solicitude").

Mr. Fernandez, as noted in the Pre-Sentence-Report, Mr. Fernandez, donated his kidney to his mother in 2009, who suffered from kidney failure and was on dialysis. Given his medical condition of being over weight and having one kidney puts him at high-risk if contracting COVID-19. Mr. Fernandez is considered a Chronic-Care-Inmate in the B.O.P. due to his medical condition. The Central Disease Control ("CDC") identified the population most vulnerable who have medical conditions, such as people with severe obesity, immunocompromised organ transplantion. See, "People at risk for serious illness from COVID-19," CDC, available at http://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html also see (New Covid-19 crisis hits ICU's as more patients need dialysis) CNN(Friday April 17, 2020) available at: http://www.cnn.com/2020/04/17/ health/coronavirus-kidney-dialysis-need/index.html .

<u>ARGUMENT:</u>

The Court never intended to sentence Mr. Fernandez to a death sentence. Now, however, because of the unthinkable spread of a global pandemic that is killing people with pre-existing medical conditions like Mr. Fernandez at alarming rates approximately 11 % percent, I face a serious risk of dying in in prison if infected. See "Severe outcomes among patients with Coronavirus Disease 2019 (COVID-19) - United States, February 12 - March 16, 2020," Centers for Disease Control and Prevention Report (March 18, 2020), available at https://www.cdc.gov/mmanr/volumes/ 69/wr/mm6912e2htm.

This unparalleled health crisis in our country and it's deadly expected arrival in our prisons present "extraordinary and compelling reasons" to grant Mr. Fernandez's Motion. As explained below, F.C.I. Fort Dix is already overcrowded - and the conditions there make it impossible for Mr. Fernandez to self-care and

3

and prevent his infection if the virus continues to spread at
this facility. "Social distancing" is not an option at F.C.I.
Fort Dix facility. See, (Ex 1) Notice to inmate population,
April 11, 2020, D. Ortiz, Warden suggestion #(5) "Social Distancing
is Not possible in this environment" the New York Times recently
explained why jails are a much more dangerous place to be than
even a cruise ship. See "An Epicenter of the Pandemic will be
Jails and Prisons, if inaction continues," The New York Times
(March 16, 2020), available at http.://www.Nytimes.com/2020/03/
16/opinion/coronavirus-in-jails html.

As of April 23, 2020, F.C.I. Fort Dix has approximately
twenty-seven hundred inmates and per a unit three inmates living
in cells of up to twelve inmates per a cell making social
distancing impossible. Based upon the COVID-19 cases of April 26,
2020. F.C.I. Fort Dix has twenty-nine positive inmate cases
and four positive staff members with each day growing "See BOP:
COVID-19 update https://www.bop.gov/coronavirus/

The humane and compassionate thing to do is to convert
Mr. Fernandez's sentence to time served or home confinement for
the remainder of it's term. As COVID-19 continues to spread and
infect at F.C.I. Fort Dix, I will not have much chance to
survive.

4

As of April 23, 2020, F.C.I. Fort Dix houses twenty-seven hundred inmates and per a unit three hundred inmates living in twelve man cells making it impossible to "social distance" at this facility. The conditions at F.C.I. Fort Dix are inhumane to this date we have not been provided any disinfection chemicals even though we all use the same bathrooms making it one of the most highly way to contract COVID-19 virus. We have given several complaints about the conditions and the safety of our well being. The staff members and correctional officers at F.C.I. Fort Dix do not practice anything recommended by the CDC when inside of our units they wear no mask or gloves, some staff members like counselor Mr. Cuevas have said to us "it doesn't matter we are all going to get it eventually" theirs no cameras inside units and everyone knows only outside the units and that were the wear the protective geat to further see the conditions at this facility. See available at "New Fort Dix Federal prison video and leaked photos" https://youtube/ryublbujupu also coronavirus is ready to explode inside Fort Dix Federal prison, incarcerated people and their loved ones say. http://theappeal. org/fortdix-prison-new-jersey-coronavirus/. As of April 23, 2020, F.C.I. Fort Dix has twelve positive inmate cases and four positive staff members with each day growing see available at BOP: COVID-19 update http://www.bop.gov/coronavirus/.

I.   **This Court has Authority to resentence Mr. Fernandez under 18 U.S.C. 3582(C)(1)(A) for "Extraordinary and Compelling Reason" created by the COVID-19 Pandemic and the prison conditions which prevent self-care for a High-Risk Patient.**

With the changes made to the compassionate release statute by the First Step Act, courts need not await a motion from the Director of BOP to resentence prisoners under 18 U.S.C. 3582(C)(1)(A)(i) for "extraordinary and compelling reason." Importantly, the reasons that can justify resentencing need not involve only terminal illness or urgent dependent care for minor children.

Congress first enacted the modern form of the compassionate release statute, codified at 18 U.S.C. 3582, as part of the Comprehensive Crime Control Act of 1984. Section 3582(C) states that a sentencing court can reduce a sentence whenever "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. 3582(C)(1)(A)(i). In 1984, Congress conditioned the reduction of sentences on the BOP Director's filing of an initial Motion to the sentencing court. Absent such a motion, sentencing courts had no authority to modify a prisoner's sentence for compassionate release.

Congress never defined what constitutes an "extraordinary and compelling reason" for resentencing under Section 3582(C). But the legislative history to the statute givens an indication of how Congress thought the statute should be employed by the Federal Courts. The Senate Committee stressed how some individual cases, even after the abolishment of Federal parole, still may warrant a second look at resentencing.

6

*The committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.

S. Rep. NO. 98-225, at 55-56 (1983)(emphasis added). Congress intended that the circumstances listed in 3582(C) would act as a "safety valves for modification of sentences," enabling judges to provide second looks for possible sentence reductions when justified by various factors that previously could have been addressed through abolished parole system. The safety valve statute would "assure the availability of specific review and reduction of a term of imprisonment for "extraordinary and compelling reasons" and (would allow courts) to respond to changes in the guidelines. "rather than a Federal parole board, the statue permitted " later review of sentences in particularly compelling situations.

Congress initially delegated the responsibility for outlining what could qualify as "extraordinary and compelling reasons" to the U.S. Sentencing Commission ("Commission"). See 28 U.S.C. 944(t) ("The Commission...Shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."). The Commission took considerable time to promulgate it's policy in response to Congress's directive. It finally acted in 2017, almost a generation later, with the very general guidance that "extraordinary and compelling reasons" may include conditions, age, family circumstances, and "other reasons." U.S.S.G. 1B1, 13, app.n.1(A). However, this guidance did little to spur the BOP to file on behalf of prisoners who might have been met these general standards.

7

After a negative Department of Justice Inspector General report found that the BOP rarely invoked it's authority under the statue to move for reduced sentences, the Commission felt compelled to act again. See U.S. Dept. of the Inspector General, The Federal Bureau of Prison' Compassionate Release Program, 1-2023-006 (Apr. 2013). The Commission ended it's policy statement on "Compassionate Release" in November 2016. See U.S.S.G. 1 B1.13 Amend (11/1/2016). In addition to broadening the eligibility guidelines for sentencing courts, the new policy statement admonished the BOP for it's past failures to file motions on behalf of inmates who had met the general criteria identified in U.S.S.G. 1B1.13. See also United States v. Dimasi, 220 F. Supp. 3d 173, 175 (D. Mass 2016)(discussing the history of the BOP, DOJ and Commission's interplay in developing guidance for "Compassionate Release" motions). Notably, the Commission concluded that reasons beyond medical illness, age, and family circumstances could qualify as "extraordinary and compelling reasons" for resentencing. Id. n.1(a)(including a category for "Other Reasons," when there is "an extraordinary and compelling reason other than, or in combination with, the reasons described in Subdivision(A) through (C).").

But see United States v. Cantu No. 1:05-CR-458-1, 2019 wl 2498923, at *4(S.D. Tex. June 17, 2019) ("holding that, given the changes to the compassionate release statue by the First Step Act, U.S.S.G. 1B1.13, application note 1(D) "ho longer fits with the Statue and thus does not comply with the Congressional mandate that the policy statement must provide guidance on the appropriate use of sentence-modification provisions under 3582"); United States v. Fox, No. 2:14-CR-03-DBH, 2019 WL 3046086, at *3 (D. Me. July 11, 2019)("I treat the previous BOP discretion to identify other extraordinary and compelling reasons as assigned now to the courts."); United States v. Cantu-Rivera, No. CR H-89-204, 2019 WL 2578272, at *2 n.1 (S.D. Tex. June 24, 2019) ("Because the current version of the Guideline policy statement conflicts with the First Step Act, the newly-enacted statutory provision must be given effect."); United states v. Beck, NO. 1:13-CR-186-6, 2019 WL 2716505, at 6 (M.D.N.C. June 28, 2019)(holding that application note 1(D) is "inconsistent with the First Step Act, which was enacted to further increase the use of compassionate release and which explicitly allows courts to grant such motions even when BOP

finds that are not appropriate," and courts thus may "consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application noted to the old policy statement"); but see United States v. Lynn, NO. CR-89-0072-WS, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019) (holding that application note 1(D).

The Commission's action, however, did little to change the dearth of filing by the BOP on behalf of inmates who satisfied the Commission's general/guidance. During the more than three decades during which the BOP was the exclusive gate keeper for "compassionate release" motions, very little effort was made to implement Congress's intention to provide a safety valve to correct injustices or allow relief under extraordinary and compelling circumstances.

Finally, this changed with the passage of the First Step Act in 2018. See P.L. 115-391, 132 Stat. 5194, at 603 (Dec. 21, 2018). Section 603 of the First Step Act changed the process by which 3582(C)(1)(A) Compassionate Release occurs: Instead of depending upon the BOP Director to determine an extraordinary circumstance and move for release, a court can now resentence "upon motion of the defendant," after the inmate exhausted administrative remedies with the BOP, or after 30 days from the receipt of the inmate's request for compassionate release with the warden of the defendant's facility, whichever comes earlier 18 U.S.C. 3582(C)(1)(A). Thus, under the First Step Act, a court may now consider the defendant's own motion to be resentenced, without waiting for to be made by the B.O.P.

9

Courts are now authorized to consider a defendant's motion, even one which the BOP oppresses, and order resentencing courts finds that "extraordinary and Compelling Reasons" warrant a reduction and such a reduction is consistent with the Section 3553(a) factors. Resentencing courts are also advised that any decisions to reduce a previously ordered sentence be "consistent with applicable policy statements issued by the Sentencing Commission. Here, while to 30-day period since the warden's receipt of Mr. Fernandez's request for Compassionate Release due to the threat of coronavirus infection has not yet passed, this court can construe the exhaustion as futile given the urgency of this national emergency and rapid spread of the pandemic.

Governs compassionate release reduction of sentence and federal judges have no authority to creat their own criteria an "Extraordinary and compelling" reason for resentencing).

## II. The Court can waive the 30-day requirement for exhaustion of Administrative Remedies Under 18 U.S.C. 3582(C)(1)(A) Because of the urgent Risk of Fatal Infection.

Mr. Fernandez filed his petition with the warden simultaneously with this Motion to the Court. Under Section 3582(C)(1)(A), Mr. Fernandez would ordinarily be required to either wait 30 days following the warden's receipts of this compassionate release request, or exhaust all administrative remedies prior to approaching the Courts, whichever happens earlier. See 1B U.S.C. 3582(C)(1)(A). However, the Court may waive these administrative exhaustion requirements, and should do so here.

10

Under clear Second Circuit precedent preceding the First Step Act, although a prisoner seeking to alter his conditions of imprisonment generally must exhaust administrative remedies before resorting to Judicial intervention, the Court may waive that prerequisite. See, e.g., Hemphill v. New York, 380 F.3d 680, 686, (2nd Cir. 2004)(under Prison Litigation Reform Act,[2] where the prisoner"did not exhaust available remedies, the Court should consider whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements," permitting the Court to waive the failure to exhaust (quotation marks and citations omitted)); Carmona v. U.S. Bur. of Prisons, 243 F.3d 629, 634 (2nd Cir. 2001)(while prior to filing a habeas corpus petition under 2241" Federal prisoners must exhaust their administrative remedies...(W)hen, however, legitimate circumstances beyond the prisoner's control preclude him from fully pursuing his administrative remedies, the standard we adopt excuses this failure to exhaust"). Thus, Courts in this Circuit have "excuse[d] exhaustion if it appears that an administrative appeal would be futile, or because the appeal process is shown to be inadequate to prevent irreparable harm to the defendant." United States v. Basciano, 369 F. Supp. 2d 344, 348 (E.D.N.Y. 2007)(under PLRA, "[a] court may, however, excuse the exhaustion requirement if a petitioner demonstrates that pursuing appeals through the administrative process would be futile or that the appeals process is inadequate to prevent irreparable harm to the petitioner")).

Prison Litigation Reform Act, 42 U.S.C. 1997 e, referred to herein as "PLRA".
Accord Vogelfang v. Riverhead City. Jail Officers, No. 07-1268-CV, 2009 WL 230132, (2nd Cir. Feb. 2, 2009)(reviewing dismissal of under Prison Litigation Reform Act action for failure to exhaust finding "[i]t was error for the District Court not to consider Vogelfang's arguments... that her failures to exhaust should be excused.").

Accord Charboneau v. Menifer, NO. US CIV. 1990 (MBM), 2005 WL 2385862 (S.D.N.Y. Sept. 28, 2005)(in addressing petition for determining eligibility for placement in a halfway house, the Court excused the defendant's failure to exhaust administrative remedies "on the grounds of futility, and the likelihood of irreparable injury before further appeals could be exhausted"), Drew v. Menifee, NO. 04 CIV. 9944HBP, 2005 WL 525449 (S.D.N.Y. Mar. 4, 2005)(granting, in part, motion "to release petitioner to community confinement in a halfway house when the petitioner has six months remaining on his sentence after deduction of good time credits," explaining that any failure to exhaust administrative remedies "should be excused on the ground of futility."); Terry v. Minfree, No. 04 CIV. 4505 (MBM), 2004 WL 2434978, (S.D.N.Y. Nov. 1, 2004)(excusing failure to exhaust administrative remedies "on the grounds of futility and irreparable injury" in 2241 habeas corpus petition determination of eligibility for transfer to a halfway house).

The First Step Act did not alter this longstanding precedent - both the administrative exhaustion procedure and the circumstances meriting its waiver remain unchanged. See, United States v. Bolino, No. 06-CR-0806 (BMC), 2020 WL 32461, (E.D.N.Y. Jan. 2, 2020)(under the First Step Act, "the same exhaustion procedure for routine administrative grievances...applies to requests for compassionate release."). Indeed, courts throughout the country have continued to waive the administrative exhaustion requirements under the First Step Act, where circumstances warrant. See, Washington v. Bur. of Prisons, No. 1:19-CV-01066, 2019 WL 6255786, (N.D. Ohio July 3, 2019)(in addressing motion for recalculation of good time credit under the Fi1st Step Act, the court explained that "(t)he failure to exhaust administrative remedies may be excused if seeking administrative remedies would be futile."); United States v. Walker, No. 3:10-CR-00298-RRB-1, ⌊DKT. 110⌋(O. or. Feb 7, 2019)(finding that, although the defendant failed to exhaust administrative remedies, the Court had jurisdiction to order recalculation of defendant's good time credit under the First Step Act and to order defendant's release if his term of imprisonment had expired); See also Gurzi v. Marques, NO. 18-CV-3104-NEB-KMM, 2019 WL 6481212, (D. Minn. Oct. 10. 2019)(despite prisoner's failure to exhaust administrative remedies, addressing the merits of prisoner's objections to his designation, in part under the First Step Act, as "the Court observes that it has the authority to proceed to the merits of the case rather than rely on a failure to exhaust when appropriate,").

The futility and potentially irreparable harm of requiring Mr. Fernandez to wait a minimum of 30 days to exhaust his administrative remedies are manifest. Mr. Fernandez seeks this emergency relief to avoid contracting COVID-19 at F.C.I. Fort Dix where he has a high risk of infection. "Social distancing" is impossible in the crowded facility and disinfectant products are scarce. Waiting for Mr. Fernandez to exhaust his administrative remedies would only compound his risk of exposure to COVID-19. Should he contract the virus while waiting for administrative response any remedy will come too late - Mr. Fernandez will be in mortal danger, causing him potentially irreparable physical harm, and rendering this compassionate release request utterly moot. See Sorbello v. Laird, NO. 06-CV-948 (JG), 2007 WL 675798, (E.D.N.Y. Feb. 28, 2007)(refusing to dismiss petition requesting designation to a halfway house "for failure to exhaust administrative remedies" where delay in processing administrative remedies would "result in the irreparable harm of late designation to community confinement"); Pimentel v. Gonzales, 367 F. Supp. 2d 365, 371 (E.D.N.Y. 2005) (addressing merits of request for designation to halfway house, Pimentel could suffer irreparable harm," as "[w]ere Pimental required to pursue administrative remedies prior to bringing this action, He would likely be done serving much, if not all of his entire sentence such that his request would become moot.").

The Bureau of Prisons has known for months of the impending COVID-19 crisis, creating a further reason to excuse Mr. Fernandez's failure to exhaust all administrative remedies. The B.O.P. has ample opportunity to adequately prepare F.C.I. Fort Dix for this emerging health crisis, which would have obviated the need for Mr. Fernandez's emergency compassionate release petition. Because the B.O.P. was on notice of the potential dangers to inmates like him, Mr. Fernandez should not be required to wait while the B.O.P. takes additional time addressing his administrative request. See

Basciano, 369 F. Supp. 2d at 349 (despite failure to exhaust
administrative remedies, because "the B.O.P. ha[d] not addressed
[his] request for relief in a timely fashion," despite "ample
opportunity" to do so, tne court found that "[t]he administrative
appeals process would thus, in the circumstance of this case, be
an empty formality that would risk exposing Basciano to irreparable
harm"). Mr. Fernandez should not be forced to bear the brunt of
the facilities failure to adequately prepare for COVID-19. In these
extraordinary circumstances, t e court should waive the
administrative exhaustion requirement in 3582.

Nor is there a colorable argument that the exhaustion requirement under the First Step Act is
jurisdictional. Like the administrative exhaustion requirements applicable to 2241 petitions, and
under thePLRA, 3582(C)(1)(A) "Lacks the sweeping and direct language that would indicate a
jurisdictional bar rather than a mere codification of administrative exhaustion requirements."
Richardson v. Giourd, 347 F. 3d 431, 434 (2nd Cir. 2003)(quotation marks and citation omitted); See
also Atkinson v. Lina Weaver, No. 13 CIV. 2790 JMF WL 5477576, (S.D.N.Y. Oct. 2, 2013)("in a case
brought pursuant to section 2241, exhaustion...does not go to the Court's jurisdiction to adjudicate
the dispute").

The factual question at issue - the rapid spread of COVID-19, the serious danger to certain high-
risk individuals, and Mr. Fernandez medical conditions placing him squarely in the highest fatal
risk group - are well -developed in the record before this Court, thus rendering administrative
exhaustion all but pointless. See Gurzi, No. 18-CV-3104-NEB-KMM, 2019 WL 6481212, at (given the
clear circumstances here, a principal purpose of administrative exhaustion, the development and
crystalization of the federal record, is not implicated in this case". (quotation marks and citation
omitted).


III  The COVID-19 Outbreak presents a Compelling and Extraordinary
circumstance that warrants Compassionate Release for Mr. Fernandez,
who is a High-Risk Fatality Patient.

III:

> The COVID-19 Outbreak presents a Compelling and
> Extraordinary Circumstance that warrants Compassionate
> Release for Mr. Fernandez, who is a High-Risk Fatality
> Patient.

On March 11, 2020, the World Health Organization ("WHO")
officially classified the new strain of Coronavirus, COVID-19, as
a pandemic. As of April 25, 2020, COVID-19 has infected at least
2,913,626 worldwide, lead to at least 202,973 deaths. In the
United States, approximately 956,229 have been infected, leading
to 72,350 deaths. These numbers almost certainly under-represent
the true scope of the crisis; test kits in the United States have
been inadequate to meet demand.

WHO characterizes COVID-19 as a Pandemic, 'World Health Organization (March 11, 2020), available
at http//bit.ly/2v8wps.

Coronavirus Map: Track the Global Outbreak. available at: https://www.worldmeters.info/coronavirus/

The New York Metropolitan area has been labeled the new
"epicenter" of the pandemic worldwide. As of April 25, 2020,
there were more than 392,975 cases in the New York Metropolitan
area, and at least 27,610 deaths. New York health officials
estimate that the numbers of hospitalizations in New York State
will doulbe every two days over the course. New York's cases of
COVID-19 now represents 7 percent of the cases worldwide.

On March 13, 2020, the White House declared a national
emergency, under Section 319 of the Public Health Service Act,
U.S.C. 247(d). On March 16, 2020, the White House issued
guidance recommending that, for the next eight weeks, gathering of
ten persons or more be cancelled or postponed. On March 20, 2020,
Governor Andrew Cuomo ordered 100 percent of all non-essential
workers to remain home, effectively Shuttering New York State's
entire economy. These drastic measures followed the insurance of a
report by British epidemiologists, concluding from emerging data
that 2.2 million Americans could die without drastic intervention
to slow the global spread of the deadly disease.

The Center for Disease Control and Prevention ("CDC") have also
issued guidance related to the deadly effects of COVID-19 on certain
high-risk patients of the population. The C.D.C. identified the
population most of the deaths to include older adults and people
of any age who have serious underlying medical conditions, such as
people with severe obesity, immunocompromised organ transportation,
chronic kidney disease and many more. For these individuals, the
C.D.C. warned to take immediate preventative actions, including
avoiding crowded areas and staying at home as much as possible.

New York Becomes 'Epicenter' of Coronavirus Pandemic, Politico New York Health Care (March 25, 2020),
at https://www.politico.com/states/new-york/newsletters/politico-new-york-health-care/2020/03/25/
new-york-becomes-epicenter-of-coronavirus-pandemic-333669.

The White House, Proclamation on Declaring a National Emergency concerning the Novel Coronavirus
Diseases (COVID-19) Outbreak (March 13, 2020) available at: https://www.whitehouse.gov/presidential-
actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid19-
outbreak/.

Sheri Fink, White House takes New Line After Dire Report on Death Toll" New York Times (March 17,
2020), available at https://www.nytimes.com/2020/03/17/us/coronavirus-fatality-rate-white-house.html?
action=click&module=spotlight&pgtype=Homepage.

Kiesha Clukey and Henry Goldman, "Cuomo orders 100% of Non-essential N.Y. Workforce to Stay Home,"
Bloomberg News (March 20,2020), available at https://www.bloomberg.com/news/articles/2020-03-20/
n-y-gov-cuomo-100-percent-of-workforce-must-stay-home.

## PART IV:

The conditions of the B.O.P. incarceration foster the spread of COVID-19, and Mr. Fernandez's pre-existing medical conditions render him particularly susceptible to an unreasonable risk of death and an inability to take preventative Measures or Self-Care recommended by the CDC.

With New York metropolitan area at the "epicenter" of the COVID-19 Pandemic, it is only a matter of time before COVID-19 consumes it's way fully into F.C.I. Fort Dix, where Mr. Fernandez is housed. Indeed, the disease already has spread widely in Burlington County, New Jersey, where Fort Dix is located with recent daily increases of cases as of April 24, 2020 a total reported cases of 2,054.

'People at Risk for Serious Illness from COVID-19," CDC (March 12, 2020), available at : http//bit.y/2vgutlp where is the coronavirus in N.J.? Latest map, update on county-by-county cases. (April 24, 2020) https://www.google.com/amp/s/www.nj.com/coronavirus/2020/04/where-is-the-coronavirus-in-nj-latest-map-update-on-county-by-county-cases-april-24-2020.html%3poutput Type=amp

Conditions of confinement at F.C.I. Fort Dix create an optimal environment for the transmission of contagious disease. People who work in the facility leave and return daily; inmates were having social, legal and medical visits regularly after the initial spread of the virus prior to the B.O.P.'s decision to stop visits for 30 days on March 13, 2020. Public health experts are unanimous in their opinion that incarcerated individuals "are at special risk, given their living situations," and "may also be less able to participate in pro-active measures to keep themselves safe," and "infection control is challenging in these settings."

17

Mr. Fernandez is powerless to take the preventative self-care measures directed by the CDC for his high-risk group to remain safe from COVID-19 infection. He cannot self-quarantine or partake in "social-distancing" in his prison facility. He is housed in a dormitory environment that beds about 12 inmates per cell. There are also community spaces where inmates and prison staff gather, including a common room, medical areas, dining hall, gym area, TV area and commissary area. These high-density areas are precisely the kind of spaces that have caused the alarmingly high-spread COVID-19.

JOSEPH A BICK, "Infection Control in Jails and Prisons," Clinical infectous Diseases 45(8): 1047-1055(2007), available at https://doi.org/10.1086/52910.

"Federal Bureau of Prisons COVID-19 Action Plan," available at http://www.bop.gov/resources/news/ 20200313_COVID|'19.jsp:

"Achieving a Fair and Effective COVID-19 Response: An open letter to Vice-President Mike Pence, and other Federal, State and Local Leaders from Public Health and Legal Experts in the United States"(March 2, 2020), at https://bit.ly/2w9v605.

During the HINI epidemic in 2009, many jails and prisons dealt with high numbers of cases because they could not maintain the level of separation and sanitation necessary to prevent wide spread infection. The Prison Policy initiative has called on American jails and prisons to release medically fragile and older adults, noting that these persons are at a high risk for serious complications and even death from COVID-19. Similarly, members of Congress have written to the BOP to urge that efforts be made to allow immediate release of inmates who are at risk of contracting COVID-19.

Keri Blakinger and Beth Schwarzapfel, "How can prisons contain Coronavirus when Purell is contraband? ABA Journal (March 13, 2020), available at https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.

"Prisons and Jails are vulnerable to COVID-19 Outbreaks," The Verge (Mar. 7, 2020), available at https://bit.ly/2TNcNZY

Peter Wagner & Emily Widra, "No need to wait for Pandemics: The public health case for criminal Justice Reform," Prison Policy Initiative (March 6, 2020), available at http://www.prisonpolicy.org/blog/2020/03/06/Pandemic.

Letters of Representatives Jerrold Nadler and Karen Bass (March 19, 2020) (DOJ and BOP must also do all they can to release as many people as possible who are currently behind bars and a t risk of getting sick. Pursuant to 18 U.S.C. 3582(C)(1)(A), the Director of the Bureau of Prisons may move the court to reduce an inmate's term of imprisonment for "extraordinary and compelling reasons.").

Given Mr. Fernandez's significant underlying medical issues that make him exceptionally vulnerable to COVID-19, compelling and extraordinary circumstances exist to support compassionate release at the unique time in our Country's history. There is an urgent need to act now, before the virus continues to spread within the prison and Mr. Fernandez becomes infected.

In summary, the COVID-19 virus is highly transmissible, extraordinary dangerous, and poses a severe threat of death to the high-risk medical profile of Mr. Fernandez. The conditions at F.C.I. Fort Dix do not allow Mr. Fernandez to take Self-Care measures required by the CDC to protect his safety.

19

**PART V:** THE RELEVANT 3553(a) FACTORS, INCLUDING MR. FERNANDEZ'S
RELEASE PLAN, FAVOR RESENTENCING

When extraordinary and compelling reasons are established,
the court must consider the relevant sentencing factors in 3553(a)
to determine whether a sentencing reduction is warranted.
18 U.S.C. 3582(C)(1)(A)(i).

In this case, a review of the Section 3553(a) factors, and
his release plans for time served or home confinement under
electronic GPS monitoring for the remainder of his unserved
original term of imprisonment, favor granting Mr. Fernandez's
Compassionate Release.

First, Mr. Fernandez's offense conduct, while concededly
serious, did not involve personal violence. While the court
acknowledges the seriousness of the Defendant's offense, the
length of the Defendant's incarceration adequately expresses the
seriousness of the offense, deters criminal conduct, and
protects under 3553(a). Because of the defendant's serious
medical conditions, the court is persuaded that the defendant
will not impose a threat to the community.

Pursuant to U.S.C. 3582(C)(1)(A), the Court finds that
extraordinary and compelling reasons warrant a reduction of the
Defendant's sentence, that the Defendant does not pose a danger
to any other person or the community, that the 3553(a) factors
support a reduction, and that the reduction is consistent with
current applicable Sentencing Commission Policy Statements.

While conceding that Mr. Fernandez's offense conduct was serious at that he still has approximately six years unserved from his original sentence, the circumstances - since this sentence was initially imposed by the Court - have certainly changed. The government cannot dispute the serious physical danger created by the current pandemic to someone with Mr. Fernandez's medical condition. It also cannot guarantee or provide any sense of confidence that this wide spread will not continue to spread through the Federal Facility of Fort Dix. If the virus continues to spread inside this prison, it will likely kill Mr. Fernandez. This court never intended to impose such a risk at the time of Mr. Fernandez's original sentencing.

I propose here that Mr. Fernandez be considered in this case that the court transfers the remaining years of his expected term of imprisonment, through April 2026, to strict home detention as a condition of supervised release or time served. In a way that Mr. Fernandez continued to face confinement as a measure of due punishment, but without serious risk to his physical health. The recently amended compassionate release statue, at 3582(C)(1)(A), authorizes the court to extend supervised release in this way. See 18 U.S.C. 3582(C)(1)(A)(the court "may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment.") Such a prolonged period of Home Confinement will meet Section 3553(a)'s purpose to give due respect for the law to acknowledge the seriousness of the offense.

Congress's expansion of the compassionate release statute by 603(b) of the First Step Act reflects congressional intent for courts to have greater flexibility to reduce sentences when compelling circumstances justify a later review. The title of the amendment "Increasing the Use and Transparency of Compassionate Release," accentuates that intent. The evolving case law also demonstrates that courts have construed their discretion to effectuate Congressional desire to increase the use of the Compassionate Release Statue encouraged by this amendment. Significantly, courts weighing 3553(a) factors have granted release to defendants with convictions for serious crimes and with histories of violence, finding that changed health circumstances, aging defendants, post-offense rehabilitation, and carefully crafted conditions of supervised release ameliorate public safety concerns.

In United States v. Bailey, for example, the defendant was sentenced to 30 years for "an extensive racketeering scheme," including a specific finding that the defendant committed offenses relating to a murder. Bailey, NO. 94-CR-481 (N.D. Ill, July 24, 2019) The parties agreed that the defendant, who was almost 90 years old and suffered from multiple health issues had satisfied the statutory requirements for compassionate release.

However, the government opposed release under the Section 3553 (a) factors due to the "reprehensible nature of the offense." The court acknowledged that the defendant's criminal history and serious offense conduct supported a denial of the requested reduced sentence. But the court weighed the more recent factors in the defendant's favor, including his institutional adjustment lack of disciplinary infractions, his advanced age, and his release plan, and concluded that they "point in the opposite direction. In weighing these more favorable factor over the

defendant's past criminal history, the court granted the reduced sentencing request, concluding that release at this stage of the defendant's life would not minimize the severity of the offense and the defendant no longer posed any credible threat to the public. See, also United States vs. Sawicz, 08-CR-287 (ARR) (E.D. N.Y. Apr. 10, 2020).

Sawicz was charged with counts pertaining to child pornography. He pled guilty to those charges in the past. He was indicted with another child pornography charge as well as a violation of supervised release for that case. In August of 2016, the court sentenced Sawicz to five years of imprisonment for a violation of supervised release. Sawicz compassionate release motion was granted and his sentence was reduced to time served. He was ordered to be immediately released upon receipt of this order ( as opposed to 14 days in quarantine at Danbury) and he was to be sentenced to home confinement that included home incarceration, to be enforced by location monitoring. The court evaluated Sawicz 3553(a) factors to determine whether to grant a reduction in sentence here. The court acknowledged that this was a serious charge and that Saciwz had already violated one term of supervised release. However, that "do[es] not justify keeping the defendant in prison amidst an outbreak of a potentially deadly virus to which he is particularly vulnerable").

## POST - CONVICTION

Mr. Fernandez has been incarcerated for approximately eight years and since his incarceration he has received one minor incident report during his pre-trial and since being in the Bureau of Prisons Mr. Fernandez, has not received no incident reports at all, instead Mr. Fernandez took advantage of his incarceration participating in over forty pre-release programs including Non-Residential Drug Program, anger management, job career, mock fair and plus many more most importantly he also participated in the Residential Drug Program becoming a mentor of the community, unfortunately Mr. Fernandez left the program because he didn't meet the criteria of benefiting for the time credit due to his 924(C)(1)(A)(i) charge. But never the less he has continued to become a model inmate and a positive person. Mr. Fernandez continues to have his family support during his incarceration receiving visits, emails and phone calls that keep his family ties strong. Mr. Fernandez's behavior during his incarceration is an example of rehabilitation and what you should use your time while incarcerated for, readjusting yourself to a pro-social world.

24

## REENTRY PLAN

If released, Mr. Fernandez will be picked up by a family member who is approved on the Bureau of Prisons visiting list since F.C.I. Fort Dix is an hour and a half away from Mr. Fernandez's residence. He will be provided with a N95 mask and gloves upon his release. Mr. Fernandez will reside with his older sister, and family members in Bronx, New York. Here he will have his own room where he can "Social Distance" and be able to self-care his prevention of COVID-19. Most importantly their is a land-line phone at his residency in case the court releases Mr. Fernandez on Home Confinement which is needed for the GPS monitor. Mr. Fernandez will be helped by family members and friends financially until he able to stabilize himself in the pro-social world. Mr. Christian Parra who is a friend of the family works as an activist and criminal justice reformer for New York State is willing to help Mr. Fernandez to get certified by O.S.H.A. and getting him a job upon his release from prison especially with medical insurance.

25

<u>CONCLUSION:</u>

For the foregoing reasons, Mr. Fernandez respectfully requests that the Court grant a reduction in his sentence to time served or transfer to Home Confinement ( to cover the unserved portion of his prison term ), with a condition of Home Confinement.

Respectfully Submitted,

JUAN HERNANDEZ 67050-054
F.C.I. FORT DIX
P.O. BOX 2000
JOINT BASE - MDL, N.J.
08640

Ex (1)

Warden Memo to inmate population

## NOTICE TO THE INMATE POPULATION

**DATE:**        April 11, 2020

**FROM:**        D. Ortiz, Warden

**SUBJECT:**     **Protecting Yourself and Others**

In order to maintain the health of staff and inmates, the
following is expected from ALL inmates:

- Wash hands with soap and water for at least 20 seconds.
- Avoid touching your eyes, nose, and mouth with unwashed hands.
- Clean and disinfect all surfaces with the approved chemical.
- Cover your cough/sneeze with tissue, immediately throw tissue in the trash and wash your hands.
- **Wear your surgical face masks!** Since Social Distancing is not possible in this environment, masks will help keep you and others from spreading viruses.
- Report symptoms (coughing, sneezing, fever, fatigue, etc.) to Health Services and/or any staff.

We ALL must do our part in protecting ourselves and others from
spreading COVID-19!

FERNANDEZ, JUAN 67050054

Post Conviction

Inmate EDucation Data Transcript

```
FTDQV            *         INMATE EDUCATION DATA           *      04-28-2020
PAGE 001         *             TRANSCRIPT                  *      15:18:18

REGISTER NO: 67050-054      NAME..: FERNANDEZ                       FUNC: PRT
FORMAT.....: TRANSCRIPT      RSP OF: FTD-FORT DIX FCI

---------------------------  EDUCATION INFORMATION  ----------------------------
FACL ASSIGNMENT DESCRIPTION                     START DATE/TIME STOP DATE/TIME
FTD  ESL HAS    ENGLISH PROFICIENT              03-28-2014 1359 CURRENT
FTD  GED HAS    COMPLETED GED OR HS DIPLOMA     03-28-2014 1358 CURRENT

----------------------------  EDUCATION COURSES  -------------------------------
SUB-FACL  DESCRIPTION                       START DATE  STOP DATE EVNT AC LV  HRS
FTD GP    WELLNESS - CPR - WEST             06-26-2019 06-26-2019  P  C  P    6
FTD GP    SOCIAL DEVELOPMENT - WEST         05-02-2019 06-10-2019  P  C  P   20
FTD GP    COMPUTER SKILLS VT9;00-10:30AM    10-13-2017 10-31-2017  P  W  V    1
BER       OIL PAINTING                      04-04-2017 06-26-2017  P  C  P   16
BER       MEN OF HONOR                      05-02-2017 06-09-2017  P  C  P   10
BER       EXPLORATORY VT COMPUTERS          05-22-2017 06-01-2017  P  C  E    4
BER       ACE POETRY CLASS                  10-27-2016 12-12-2016  P  C  P    8
BER       FAMILY REUNIFICATION PROGRAM      04-22-2016 08-01-2016  P  C  P   40
BER       SUCCESSFUL THINKING ACE           04-18-2016 04-29-2016  P  C  P    6
BER       ACE ADVANCED ENTREPRENEUR DEV.    03-08-2016 05-05-2016  P  C  P   20
BER       MASTER THE INTERVIEW              01-20-2016 04-07-2016  P  C  P   16
BER       MEN OF GOALS GROUP (RPP 2)        01-12-2016 03-11-2016  P  C  P    8
BER       HISTORY OF WESTERN FRONTIER       01-07-2016 02-11-2016  P  C  P   10
BER       ACE WWII HISTORY CLASS            01-07-2016 02-11-2016  P  C  P    5
BER       AFRICAN-AMERICAN HISTORY          10-13-2015 11-24-2015  P  C  P   18
BER       PARENTING CLASS- B (RPP 6)        07-22-2015 10-22-2015  P  C  P   20
BER       GENERATING CAREER OPTIONS         09-09-2015 09-09-2015  P  C  P    1
BER       OVERCOME BARRIERS                 09-09-2015 09-09-2015  P  C  P    1
BER       YOU ARE HIRED                     09-09-2015 09-09-2015  P  C  P    1
BER       21ST CENTURY MONEY MNGT (RPP3)    05-11-2015 07-23-2015  P  C  P   16
BER       MOCK JOBFAIR INTERVIEW (RPP 2)    05-06-2015 07-13-2015  P  C  P    3
BER       ANGER MANAGEMENT(RPP6)            04-27-2015 07-08-2015  P  C  P   12
BER       MOCK JOB FAIR PREPARATION         06-23-2015 06-24-2015  P  C  P    5
BER       HEALTH FAIR                       05-06-2015 05-06-2015  P  C  P    1
BER       HOUSING ASSISTANCE 101 (RPP 4)    04-03-2015 04-09-2015  P  C  P    1
BER       SCIENCE OF HEALTHY AGING          03-04-2015 03-04-2015  P  C  P   16
BER       NUTRITION                         01-07-2015 02-28-2015  P  C  P   16
BER       INTRO TO BASIC ACCOUNTING         12-06-2014 02-19-2015  P  C  P   32
BER       RULES OF WORK (RPP2)              02-19-2015 02-19-2015  P  C  P    1
BER       BASIC JOB INTERVIEW PREPARATIO    11-12-2014 11-12-2014  P  C  P    1
BER       WRITING TO BE UNDERSTOOD          11-12-2014 11-12-2014  P  C  P    1
BER       AUTO DEALERSHIP START-UP          09-15-2014 09-30-2014  P  C  P    5
BER       ACE REAL ESTATE 101               07-28-2014 09-16-2014  P  C  P    5
BER       COLLEGE AND BEYOND                08-29-2014 09-16-2014  P  C  P    3
BER       YOUR FIRST BUSINESS PLAN          07-16-2014 08-05-2014  P  C  P    5
BER       LIMITED LIABILITY CORP            06-27-2014 07-22-2014  P  C  P    5
BER       ACE CONSTRUCTION TRADES           05-02-2014 06-12-2014  P  C  P    4
BER       MENTAL ACTION PLAN                05-05-2014 06-11-2014  P  C  P    6
BER       BUSINESS ETIQUETTE                04-28-2014 04-28-2014  P  C  P    1
BER       FROM PRISON TO PAYCHECK           04-17-2014 04-22-2014  P  C  P    1

G0002     MORE PAGES TO FOLLOW . . .
```

```
  FTDQV        *          INMATE EDUCATION DATA          *     04-28-2020
PAGE 002 OF 002 *              TRANSCRIPT                *     15:18:18

REGISTER NO: 67050-054    NAME..: FERNANDEZ                FUNC: PRT
FORMAT.....: TRANSCRIPT    RSP OF: FTD-FORT DIX FCI

---------------------------- EDUCATION COURSES ----------------------------
SUB-FACL   DESCRIPTION            START DATE  STOP DATE EVNT AC LV  HRS
BER        DRESS FOR SUCCESS      04-10-2014 04-18-2014  P  C  P    1
BRO M      INTERNET NAVIGATION    07-15-2013 08-19-2013  P  W  V    2




G0000      TRANSACTION SUCCESSFULLY COMPLETED
```

**Bureau of Prisons**
**Psychology Services**
**Group Participation**

**\*\*SENSITIVE BUT UNCLASSIFIED\*\***

| | | | | | Reg #: 67050-054 |
|---|---|---|---|---|---|
| **Inmate Name:** | FERNANDEZ, JUAN | | | | |
| **Date of Birth:** | 12/08/1984 | **Sex:** M | **Facilitator:** | (P)Chelmo, Adam MS/DTS | |
| **Date:** | 02/03/2015 | **Group Facility:** BER | **Group Title:** | [23] FCI Drug Education Winter 2015 | |

**Status:** Completed
**Enroll Date:** 03/03/2015     **End Date:** 05/12/2015
**Total Hours:** 14.0

## SESSION DATA:

**Number of Sessions:** 10     **First Session Date:** 03/06/2015     **Last Session Date:** 05/08/2015

| Date | Title | Duration | Attendance | Participation | Homework |
|---|---|---|---|---|---|
| 05/08/2015 | session 10 | 120 | Complete Session | Good | Satisfactory |
| 05/01/2015 | Session 9 | 120 | Complete Session | Good | Satisfactory |
| 04/24/2015 | session 8 - staff reassignment, no drug ed group today | 0 | Absent Excused | Not Apply | Not Apply |
| 04/17/2015 | session 7 | 120 | Complete Session | Good | Satisfactory |
| 04/10/2015 | session 6 | 120 | Complete Session | Good | Satisfactory |
| 04/03/2015 | session 4 | 90 | Complete Session | Good | Satisfactory |
| 03/27/2015 | session3 | 90 | Complete Session | Good | Not Apply |
| 03/20/2015 | no drug ED - institutional lockdown | 0 | Absent Excused | Not Apply | Not Apply |
| 03/13/2015 | session 2 | 90 | Complete Session | Good | Not Apply |
| 03/06/2015 | session 1 | 90 | Complete Session | Good | Not Apply |

| Attendance | | Participation | | Homework | |
|---|---|---|---|---|---|
| Complete Session Present | 80.0 % | Good | 80.0 % | Not Apply | 50.0 % |
| Incomplete Session Excused | 0.0 % | Fair | 0.0 % | Satisfactory | 50.0 % |
| Incomplete Session Not Excused | 0.0 % | Poor | 0.0 % | Unsatisfactory | 0.0 % |
| Absent Excused | 20.0 % | Not Apply | 20.0 % | | |
| Absent Not Excused | 0.0 % | | | | |

NON-Residential Drug program



CERTIFIED MAIL

7017 3380 0001 0749 0219

FEDERAL CORRECTIONAL
INSTITUTION
P.O. BOX 2000
FORT DIX, NJ 08640    5/15/20
The enclosed letter was processed through special mail
procedures. This letter has been neither opened nor
inspected. If the writer raises a question or problem over
which this facility has jurisdiction, you may wish to return
the material. If the writer encloses correspondence
forwarding to another address or other matters unauthorized
itera, please return to the above address

Juan Fernandez
67d
F.C.I at D*X
P.O. Box 2000
Joint Base MDL, NJ 08640

United States District Court
Second Circuit - Southern District of NY
Thurgood Marshall
United States Courthouse
4D Foley Street
New York, NY 10007

Attn: Honorable Jesse M. Forman

USM40LD
SDNY